Don T. Allen and Helen M. Allen v. Commissioner.
Allen v. Commissioner
Docket No. 62379.
United States Tax Court
T.C. Memo 1959-227; 1959 Tax Ct. Memo LEXIS 25; 18 T.C.M. (CCH) 1101; T.C.M. (RIA) 59227; November 30, 1959
*25 Petitioner was the president and principal stockholder of a corporation which was newly organized, with only $4,000 cash paid-in for capital stock, to enter into a $700,000 contract for building and completely equipping houses by use of an assembly-line process within a plant. The corporation obtained the funds with which to erect its plant, acquire its lumber and supplies, and carry on its operations: (1) Through cash advancements made to it by petitioner and the other principal stockholders; (2) through petitioner's payment of certain expenses connected with the corporation's business; and (3) through bank loans and F.H.A. financing, which petitioner and one of the other principal stockholders guaranteed. During the second year of the corporation's operations, it encountered difficulties which resulted in its insolvency and complete liquidation. Held: That all payments and advances which petitioner made to or for said corporation, other than the final advancement which he made to effect discharge of a bank loan that he had guaranteed, represented contributions to the corporation of equity capital; and that the loss which he incurred in respect thereto, is deductible only as a capital *26 loss for the year in which the corporation became insolvent and was liquidated. Held, further: That petitioner's loss in respect to his final advancement to said corporation, which was made for the specific purpose of enabling the corporation to pay the bank loan that he had guaranteed, was a guarantor's loss which, under the facts here present and the doctrine of Putnam v. Commissioner, 352 U.S. 82, is to be treated as a loss from a nonbusiness bad debt; and that said loss is deductible by petitioner only as a short-term capital loss for the year in which said advancement was made. Joseph R. Barnet, Esq., 735 North Water Street, Milwaukee, Wis., for the petitioners. Delman H. Eure, Esq., and Julian L. Berman, Esq., for the respondent. PIERCE Memorandum Findings of Fact and Opinion PIERCE, Judge: Respondent determined deficiencies in the income taxes of the petitioners for the years 1952 and 1953, in the respective amounts of $12,570.66 and $9,974.80. Petitioners dispute these amounts, and claim an overpayment for the year 1953 in the amount of $681.46. The issue for decision is whether losses incurred by the principal petitioner, in respect of various payments and advancements which *27 he made to or for the benefit of a newly organized corporation of which he was the president and a principal stockholder, should be classified for deduction by him: (1) As capital losses or nonbusiness bad debts, subject to the statutory limitations applicable thereto; or (2) as business expenses, business losses, or business bad debts, which are not subject to such limitations. Findings of Fact Certain facts have been stipulated. The stipulation of facts, together with the exhibits thereto attached, is incorporated herein by reference. Petitioners, Don T. Allen and Helen M. Allen, are husband and wife residing in Milwaukee, Wisconsin. They filed a joint income tax return for each of the taxable years involved with the district director of internal revenue at Milwaukee. The term "petitioner," as hereinafter used, refers only to the husband Don T. Allen. Mobilhome Corporation of America (hereinafter called the Bakersfield corporation) is a California corporation which at all times material had its principal place of business in Bakersfield, California. It held certain patents and copyrights covering a process for completely building and equipping small houses on a mass production assembly-line *28 basis within a plant, and then transporting the same on low-bed trailer trucks to residential sites where foundations for them were prepared. The corporation engaged in granting franchises for the use of this process to licensees throughout the United States; and by the end of the year 1951, it had granted about 15 such franchises. Two brothers, Hugh and Roland Curran, who resided in or near Bakersfield, California, controlled the corporation; and they were its principal officers and stockholders. The petitioner, in January 1949, became associated with said Bakersfield corporation, as an agent for obtaining licensees in an area covering about five Middle West states. He received no salary for his services, but rather commissions based on the franchise fees and royalties paid by the licensees whom he obtained. He succeeded in obtaining five licensees by the end of the year 1950. In connection with his work, he never made cash advancements or loans to anyone. During the taxable years here involved, petitioner was a vice-president and a minority stockholder of said Bakersfield corporation. In 1950, petitioner purchased the business of a licensee of the Bakersfield corporation, who had *29 a franchise for the Milwaukee area; and thereafter and during the taxable years involved, he, as a franchisee of said corporation, actively and successfully carried on business as a sole proprietor under the name of Don T. Allen Industries, in constructing and selling houses under the Bakersfield process in said Milwaukee area. Also in about September 1952, he and certain of his employees organized a corporation, known as Mobilhome Corporation of Milwaukee, which thereafter acted as agent for his proprietorship in selling the houses. In January 1952, Hugh Curran of the Bakersfield corporation called petitioner on the telephone; said that he was negotiating a deal with a general contractor for the American Smelting & Refining Company, to act as a subcontractor in building 100 houses for use at a mine site located about 40 miles from Tucson, Arizona; and he invited petitioner to participate in the project. The contract price for said 100 houses was to be about $700,000, of which 95 per cent was to be paid when the houses were delivered, with the balance to be paid when they were accepted; and construction was to begin in about 30 days. Petitioner accepted the invitation to participate. *30 Thereupon, under date of February 19, 1952, he together with Hugh and Roland Curran organized an Arizona corporation to handle the project. This corporation was named Mobilhome Corporation of Tucson (hereinafter called the Tucson corporation); and it is this corporation which is principally involved in the instant case. The stockholders of said Tucson corporation, their proportionate share interests (which continued without change), and the amounts which they paid for these interests, were: Petitioner
40%
$2,000 cash
Hugh Curran
20%
1,000 cash
Roland Curran
20%
1,000 cash
Ned H. Abrams
10%
Architectural
services
Frank Keller
10%
Architectural
services
Total cash paid in
$4,000 The officers of said corporation throughout its existence, were: Petitioner
President and general manager
Roland Curran
Vice president and secretary
Hugh Curran
Treasurer The directors were the three last-named individuals, together with said Ned H. Abrams and petitioner's son Jerre G. Allen. During the month of February 1952, the Tucson corporation entered into the contract to build said 100 houses; leased a plant site in Tucson; erected its plant thereon; opened a bank account in which the contributions of the stockholders were deposited; *31 and began its construction operations. The cost of the plant was about $15,000; and in connection therewith, Hugh Curran advanced $22,466.65 to the corporation for plant materials, supplies and inventory. Also the petitioner, under dates of March 17 and April 9, 1952, made cash advances to the corporation in the respective amounts of $5,000 and $2,500 (total $7,500); and in addition, he during the year 1952 (on dates not specified) incurred the following expenses in connection with said corporation's business: Traveling expenses of Allen (Mil-
waukee-Tucson-California)
$5,377.32
Promotional expense
370.06
Telephone tolls
285.90
Attorneys' fees
291.27
Salaries and expense of two em-
ployees of Don T. Allen Indus-
tries, who became employees of
the Tucson corporation
3,126.81
Total
$9,451.36 *
No promissory note or other evidence of indebtedness was executed to cover any of the above-mentioned 1952 advances and expenses paid by petitioner; and no arrangement was made as to any date for repayment, or *32 for payment of any interest thereon. Under date of April 12, 1952, the Tucson corporation, acting through petitioner and Hugh Curran, made financing arrangements with The Valley National Bank of Phoenix, Arizona, under which said bank agreed to make loans to said corporation, up to a maximum principal amount of $50,000. As a condition precedent to such arrangement, the bank required and obtained a written "Subordination Agreement," which was executed both by the Tucson corporation and by petitioner and Hugh Curran, individually. This subordination agreement provided among other things that, so long as the Tucson corporation, as borrower, was indebted to the bank on account of any principal or interest under said loan agreement, or on any renewal, modification or extension thereof, and also so long as the bank was committed to make any advances to said corporation in connection with such loan agreement, "Any indebtedness of the Tucson corporation to the bank would be preferred, over any indebtedness owing by said corporation either to petitioner or to Curran; and "In the event a petition in bankruptcy should be filed against said corporation, or a receiver should be appointed therefor, *33 petitioner and Curran would assign to the bank any claims which they might have against the corporation, with power in the bank to apply any proceeds therefrom against any indebtedness owing by the corporation to the bank." Also, in compliance with a further condition imposed by said bank, petitioner and Curran each personally guaranteed repayment to the bank of all loans which it might at any time make to the Tucson corporation. The first loan made by the Phoenix bank to the Tucson corporation pursuant to said financing arrangements, was made in April 1952, in the amount of $50,000. This loan was made subject to another special condition that the Tucson corporation would assign to the bank $500 of the proceeds from each of the 100 mining site houses to be built, so that the entire loan would be self-liquidating. During the summer of 1952, the Tucson corporation constructed the 100 houses for the mining site, successfully and on time as planned; and it also constructed two larger buildings in connection with said project, consisting of a commissary and a mess hall. From these operations it derived a substantial profit, as is conceded by petitioners in their pleadings herein. By September *34 1952, the entire amount owing by it to the Phoenix bank on its above-mentioned $50,000 loan, was fully paid; and also, all the above-mentioned advancements of $22,466.65 which Hugh Curran had made to the corporation for materials and supplies were repaid to him. However, no repayments were made to petitioner in respect of any of his advancements which then, exclusive of his $2,000 stock investment, totaled $17,051.36. In the late summer of 1952, petitioner and Hugh Curran decided to expand the operations of the Tucson corporation, to include the construction of houses for sale to the public in the residential areas of the City of Tucson; and this plan was immediately given effect. In connection therewith, a second loan of $20,000 was made by the Tucson corporation from the Phoenix bank. Such loan, like the prior one, was covered by the existing loan agreement, and also by the same continuing personal guarantee of petitioner and Hugh Curran, that the loan would be paid. Also pursuant to said expanded construction program, applications were made to the Federal Housing Administration for loans on single houses in the City of Tuscon; and in connection therewith, petitioner and Hugh Curran *35 were requested to, and did, enter into agreements under which they personally guaranteed performance by the Tucson corporation, in completing to the satisfaction of the F.H.A. any and all houses which said agency undertook to finance. The operations of the Tucson corporation in constructing and selling individual houses continued during the remainder of the year 1952. Much of the needed lumber and material was furnished by the Bakersfield corporation; an office building and storage building were added to the plant; several contracts to build houses were executed; and a considerable number of separate houses were built and sold. In the latter part of the year 1952, the Tucson corporation began to experience financial and operating difficulties; and petitioner then realized that the corporation's prospects for sale of separate houses in the City of Tucson was not good. He sought equalization of the stockholders' advances from Hugh Curran; and thereupon the latter, under dates of December 8 and 24, 1952, advanced a total additional amount of $10,000 to the corporation. As of December 31, 1951, the Tucson corporation had profits and surplus of about $4,600; and the amount owing to the *36 bank had been reduced to $15,000. It filed a corporate income tax return for the year 1952. None of petitioner's advances to the corporation was repaid. Early in January 1953, petitioner and Hugh Curran had a conference, at which they agreed: That the operations of the Tucson corporation would be gradually wound up, by completing such houses which were then in process of construction, and by contracting to build such additional houses as would use up the substantial supply of lumber and materials on hand; and that the corporation would then sell its plant properties, pay all its non-stockholder creditors, and thereupon be fully liquidated. This agreement was given effect. On January 7, 1953, the Tucson corporation renewed and extended the due date for its existing obligation to the Valley National Bank of Phoenix, by executing and delivering a new promissory note for $15,000, which was made payable in 90 days. This promissory note was signed by petitioner as the corporation's president; and the loan, like all prior ones, was made subject to the continuing agreement of petitioner and Hugh Curran that their own personal claims against the corporation would be subordinated to claims of *37 the bank, and that each of said stockholders personally guaranteed that such loan would be paid. Also, under dates of February 2 and 4, 1953, petitioner and Roland Curran made additional advances to the Tucson corporation in the amount of $10,000 each, for which no promissory note or other evidence of indebtedness was currently executed. Thereafter, the Tucson corporation continued to contract, build and sell houses until April 27, 1953, when it sold its Tucson plant to the lessor of its plant site, for the sum of $10,000. The terms of this sale, which were reduced to writing, were: (1) That the Tucson corporation's existing lease for the plant site would be cancelled; (2) that the indebtedness of the corporation to the lessor would be deducted from the purchase price; and (3) that the Tucson corporation agreed that all outstanding indebtedness against it "will be paid in full, and that there will be no liens of any kind outstanding against them." By October 1953, the Tucson corporation had fully paid all its outstanding indebtedness, except $6,500 which was still owing to the Phoenix bank. Under date of October 17, 1953, this bank indebtedness was paid, pursuant to the above-mentioned *38 guarantee of petitioner and Hugh Curran, through the following payments made to the Tucson corporation for such specific purpose: Petitioner
$3,250
Hugh Curran
1,625
Roland Curran
1,625
In December 1953, promissory notes were executed for the first time by the Tucson corporation, to evidence the amounts of the advances which petitioner and the two Currans had made to it in 1953. By that time the corporation had entirely discontinued its operations and had been fully liquidated; and said notes, at the time they were issued, were uncollectible and worthless. The stock of the Tucson corporation became worthless in the year 1953. The corporate books and records of the Tucson corporation, from the time it was created until it was fully liquidated, were maintained by Hugh Curran in Bakersfield; and he handled practically all the corporation's receipts and practically all its expenses and other disbursements. These books of account were not available to petitioner at the time of the trial; and it was believed that they had either been lost or destroyed. Petitioner did not know what were the accounts payable of the Tucson corporation for either of the taxable years involved, or what became of the *39 corporation's charter after its business operations were discontinued. In the joint income tax return of petitioner and his wife for the year 1952, petitioner deducted as "business bad debts" of his Milwaukee proprietorship, the amount of $10,490.38 in respect of his payments and advances to or for the Tucson corporation. This amount included the advancements of $7,500, which he had made to said corporation in March and April 1952, and also certain expenses totaling $2,990.38 which he had paid to or for the corporation in that year. Also on said return, he deducted, as a miscellaneous personal item, the amount of $6,560.98 which represented travel and business expenses paid by him for the Tucson corporation during the year 1952. Thereafter in the joint income tax return of petitioner and his wife for the year 1953, petitioner deducted as a "long-term capital loss," the amount of his $2,000 investment in the Tucson corporation's stock; and he further deducted, as "business expenses" and "business bad debts" of his Milwaukee proprietorship, the amount of $13,250 which represented the additional advances he had made to the Tucson corporation in said year 1953. The respondent, in his notice *40 of deficiency, allowed the $2,000 long-term loss for the year 1953, which petitioner had claimed with respect to his investment in the Tucson corporation's stock; but he disallowed all the other above-mentioned claimed deductions. He determined that all payments and advances which petitioner had made to or on behalf of the Tucson corporation, represented capital contributions which were deductible for the year 1953 only, as capital losses. And he further determined, in the alternative, that if any part of such payments or advances represented a "loan" to said corporation, any loss resulting from the failure of the corporation to repay such loan, was a nonbusiness bad debt for the year 1953 only, which under section 23(k) of the 1939 Code is to be considered a short-term capital loss. He then applied the provisions of sections 23(g) and 117(d) of said Code, pertaining to limitation on capital losses, and determined the deficiencies here involved. Opinion The overall picture disclosed by the evidence herein, is that of a newly formed corporation (known as the Tucson corporation) which petitioner and the two Curran brothers organized with only $4,000 cash paid-in for capital stock, for *41 the specific purpose of having this corporation enter into a $700,000 contract for the building of 100 houses at an Arizona mine site, and of having it rent a plant site, build a plant, and procure labor and materials for handling such project. Most of the corporation's operating funds, which were committed to risk in this project and also in a subsequent project of building separate houses for sale to the public in the City of Tucson, were obtained from the following sources: (1) From cash advancements made to it, from time to time, by its three principal stockholders including the petitioner; (2) from petitioner's payment of certain expenses of the corporation; and (3) from large bank loans, and also F.H.A. financing in connection with the subsequent project - all of which the corporation obtained solely upon the personal credit of petitioner and Hugh Curran, and which these two stockholders personally guaranteed. The corporation performed its construction of the 100 mining site houses, successfully and on time as originally planned; and it derived a substantial profit therefrom. But it then expanded its operations into the construction of the above-mentioned separate houses for *42 sale to the public in the City of Tucson - which expanded activity subsequently led to its insolvency and liquidation. Our present problem is to determine how the losses which the petitioner incurred, in respect to the several payments and advances which he made to or for the benefit of such corporation, should be classified for deduction by him for Federal income tax purposes. 1. The first payment which petitioner made to or for the Tucson corporation, was the $2,000 which he paid in 1952 for his 40 per cent interest in said corporation's capital stock. In his 1953 return, petitioner deducted his loss with respect to this item as a long-term capital loss for said year; and the respondent allowed such deduction. But petitioner now contends that said loss should be allowed to him in his individual capacity, free from the statutory limitations attaching to capital losses, either as an ordinary and necessary business expense, or as a business bad debt, or as a business loss. Such revised position is apparently based on the grounds, either that the operations of the Tucson corporation were in the nature of a "joint venture" of the Bakersfield corporation and of his Milwaukee proprietorship; *43 or that they were a mere adjunct to the operations of his Milwaukee proprietorship business, or to his personal sales activities in obtaining franchises for the Bakersfield corporation. This revised position of petitioner fails to find support in the evidence; and we are convinced that it is entirely without merit. The Tucson corporation was organized as a corporation, under the laws of the State of Arizona; it actively operated as a corporation during both taxable years involved, in entering into the $700,000 contract, in renting a plant site, in building and equipping its plant, and in building and selling houses; and it also acted as a corporation, in arranging bank loans and F.H.A. financing, in maintaining corporate books of account, and in filing a corporate income tax return, at least for the year 1952. In no sense was it a partnership or "joint venture," within the meaning of section 3797(a)(2) of the 1939 Code; but rather, it was subject to those provisions of said Code which pertain to "corporations." The general rule is that, except in unusual circumstances (not here present), a corporation is to be treated as an entity separate from the individuals who own it. And, as *44 was recognized by the Supreme Court in , where persons have employed the corporate form for carrying on business, any disadvantages which may result from the use of such form can not be disregarded. Also, the evidence fails to establish that the Tucson corporation had any direct relationship to petitioner's Milwaukee proprietorship, or to his earlier employment as an agent for soliciting franchises on behalf of the Bakersfield corporation. To the contrary, the Tucson corporation had its own stockholders, principal among whom were petitioner and the two Curran brothers; it had its own contracts; it operated in a separate franchise territory far removed from Milwaukee; it purchased no supplies or products from the Milwaukee proprietorship; it furnished no manufactured product of its own to said proprietorship; and it dealt only with its own customers, including the contractors for the mining project and residents of the City of Tucson. And as regards petitioner's former activities in acting as a salesman or solicitor of franchises for the Bakersfield corporation, there is no evidence that he obtained any such franchise subsequent to the year 1950. We approve *45 the treatment of the $2,000 stock investment, which petitioner adopted in his 1953 return and which the respondent thereafter approved and allowed, i.e.: That the loss incurred by petitioner in respect of his $2,000 investment in the capital stock of the Tucson corporation is allowable only for the taxable year 1953, as a long-term capital loss. 2. The next payments or advances which petitioner made to the Tucson corporation are the amounts of $5,000 and $2,500 which he advanced on March 17, 1952, and April 9, 1952, respectively. The obvious purpose of these advances was that, since said corporation had only $4,000 cash paid in for its capital stock, it immediately required additional operating funds with which to rent its plant site, erect and equip its plant, and obtain labor, lumber, and other supplies with which to perform its $700,000 contract. In the absence of any substantial cash or credit of its own, it necessarily was compelled to rely upon advances of cash and credit made by its principal stockholders, including the petitioner who held the largest stock interest. Thus the $7,500 advances of petitioner which we are here considering, were definitely placed at the risk of the *46 corporation's business; they were not evidenced by any promissory note or other instrument of indebtedness; and no arrangement was made, either as to time for their repayment or as to payment of any interest thereon. Moreover, these cash advancements were subsequently subordinated to the corporation's loans from the Phoenix bank; and, unlike the initial advancements of $22,466.65 made by Hugh Curran and the initial bank loan of $50,000, they were not repaid, even after the corporation had derived substantial profits and had acquired an earned surplus for the year 1952, from its construction of the 100 mine-site houses. The fact that petitioner may have designated or regarded such $7,500 advancements as "debts," is not determinative; for it is well settled that in determining the character of transactions for Federal income tax purposes, it is not the formalities (however meticulously observed) in which the parties cast their transactions, but rather the substance of the transactions and the true relationship created thereby, which are controlling. Rudolf A. Zivnuska, 33 T.C. -, (Nov. 9, 1959); , affd. (C.A. 7) ; ; *47 1432 , affd. per curiam (C.A. 2) . To classify the same as "loans," would result in the Tucson corporation having a "debt" structure composed of stockholder loans and bank loans with which to carry on its operations, which is so disproportionate to its equity capital as to be wholly unrealistic. Even if said advances of petitioner could be regarded as "loans," as distinguished from contributions of equity capital, there is no justification in the evidence for classifying them as business debts, rather than as nonbusiness debts on which losses would be subject to the capital gain limitation on deductions. Petitioner at no time engaged in the business of loaning money to anyone; and the fact that he was an officer and stockholder both of the Tucson corporation and of the Bakersfield corporation, is not sufficient to qualify him as being in a money-lending business. See, ; ; Rendlen, et al. v. United States, (E.D. Mo., Oct. 1, 1959) - F. Supp. -. We find no warrant whatever for concluding that any portion of petitioner's 1952 advances became worthless in that year, while the corporation *48 was still solvent and in operation; or that they were deductible in said year. Rather, we approve the respondent's determination, that all of petitioner's 1952 payments and advances represent contributions of equity capital made by him to the Tucson corporation; and that his loss with respect thereto, is allowable only as a 1953 capital loss. 3. What we have said above applies also for the most part to the expenses totaling $9,551.36 which petitioner paid in 1952 in connection with the Tucson corporation's business. This item, since it has been stipulated to represent payments made in connection with the corporation's business, would appear to be deductible only by the corporation (a separate taxpayer), as part of the cost of producing its own income. It therefore might properly be held that petitioner is not entitled to any personal deduction whatever in respect of these corporate expenses. See ; . Nevertheless, the respondent has treated the amounts so paid by petitioner as an additional contribution made by him to the equity capital of the Tucson corporation; and he has allowed petitioner a capital loss in respect of the same, *49 for the year 1953. We approve such action of the respondent. 4. As regards the further advance of $10,000 which petitioner made to the Tucson corporation on February 2, 1953, certain other facts require consideration. At the end of the year 1952, petitioner and Hugh Curran recognized that the business prospects for the Tucson corporation were not favorable; and thereupon they proceeded to equalize or adjust the amounts of their respective advances. Also, in the early part of January 1953, they agreed: That the operations of the Tucson corporation should gradually be wound up, by having it complete the houses which were then under contract or in the course of construction, and by having it contract for and construct such additional houses as would consume its substantial inventory of lumber and supplies; and that thereafter, the corporation should be liquidated, by having it pay all its outstanding obligations and loans. This plan, in itself, required that additional working capital be placed at the risk of the corporation's business in its continued operations. Accordingly, petitioner and Roland Curran paid to the corporation, in February 1953, additional advances of $10,000 each. *50 Also, arrangements were made by the corporation with the Phoenix bank, to extend for 90 days the due date for the existing balance of $15,000 on its bank loan; and, as in the case of all prior bank loans, petitioner and Hugh Curran personally guaranteed that this extended loan would be paid. No promissory notes were currently executed to cover said additional advances of these principal stockholders; and no such notes were subsequently issued until December 1953, after the corporation had completely ceased all its operations and had become fully liquidated. Thus, these notes which merely evidenced earlier contributions of equity capital were worthless when issued. Indeed, both petitioner and the Currans knew, at the time their additional 1953 advances were made, that payment thereof would never be made; so the advances could not qualify as "loans." In the absence of any corporate books of account whatever, petitioner has failed to establish that any portion of the advancement which he made on February 2, 1953, was used by the Tucson corporation for purposes other than to pay wages, subcontractors, and operating expenses during its continued construction operations. Accordingly, he *51 has failed to establish any error in the respondent's determination, that said advancement represented an additional contribution of equity risk capital to said corporation; and that the loss which he incurred in respect thereto, is allowable only as a capital loss for the year 1953. 5. The final advance of $3,250, which petitioner made to the Tucson corporation on October 17, 1953, was for the specific purpose of enabling it to pay his portion of the balance of its loan from the Phoenix bank. The total remaining balance of this loan was $6,500; and it was covered by the abovementioned personal guarantees of petitioner and Hugh Curran. The petitioner paid, as his portion thereof, the said amount of $3,250; and Hugh and Roland Curran similarly paid as their respective portions thereof, the amounts of $1,625 each. Thus the payment so made by petitioner was to discharge, through specific application of the same, his personal guarantee of the corporation's bank indebtedness. Under the facts here present, and on authority of the Supreme Court's opinion in , affirming (C.A. 8) , and affirming also a Memorandum Opinion of this ; *52 , petitioner's resulting loss as a guarantor in respect of this item, constituted a nonbusiness bad debt. Such nonbusiness bad debt is, under the provisions of section 23(k)(4) of the 1939 Code, deductible only as a short-term capital loss. We are satisfied from our examination of the entire evidence, that petitioner and his wife are not entitled to the relief which they here seek. Respondent properly disallowed deduction for the year 1952, of any portion of the payments and advances which petitioner made to or for the benefit of the Tucson corporation in said year. And, since petitioner and his wife deducted on their 1953 return, and were allowed, the maximum net capital loss of $1,000, no further capital loss deduction for said taxable year is allowable. Decision will be entered for the respondent. Footnotes
*. This total is shown in the stipulation of facts to be $9,551.36. Such amount agrees with the deduction claimed in petitioners' 1952 return; and accordingly, it is hereinafter referred to in that amount.↩